# MAY 6, 1942

EDWARD HART, JR., V. THE STATE.

No. 22102. Delivered May 6, 1942.

The opinion states the case.

*Joe V. Moore,* of Dallas, for appellant.

*Chas. A. Pippen,* Assistant District Attorney, of Dallas, and *Spurgeon E. Bell,* State's Attorney, of Austin, for the State.

GRAVES, Judge.

Appellant, a negro, was convicted of rape upon Mrs. Bertha Bednar, a white woman thirty-two years of age, and by the jury awarded the death penalty, hence this appeal.

Mrs. Bednar was the mother of three children; she lived in Dallas, and upon the occasion in question, the night of July 27,

1941, after her children had gone to bed, she, her husband and a friend of the husband's went to a restaurant and there remained until about 2 o'clock A. M., talking and listening to the music, the men drinking beer. Upon a return to her home her husband, who had imbibed rather freely, decided to go back and get some more beer, to which she objected. Upon his insistence, however, Mrs. Bednar decided to go over to the home of a neighbor's to spend the night, her mother being left with the children. On her way over, while on a graveled walk, she heard a sound as of some one behind her walking on the gravel, and she turned just as a negro leaped on her and knocked her down and began choking her. She endeavored to cry out but partially lost consciousness on account of the grip on her throat. She fought as hard as she could but her assailant jerked her watch off, tore her clothing and beat and bruised her. He then dragged her into a vacant lot and there raped her. He then got her arm and twisted it around and mashed her mouth open and stuck his tongue in her mouth, and then got up and ran away.

She was in her menstrual period, and had on a sanitary belt, which her assailant tore off her, and her torn clothing, her new stockings, torn and containing grass burrs, her torn underclothes and panties were all exhibited before the jury and identified by her.

After the assailant had fled she, having lost one of her shoes in the struggle, was looking for such shoe, and she went back to where she was first attacked and there found her pocketbook, and near thereto she found another pocketbook, which she picked up and placed in her purse. She then went out in the street and got some people to take her home. She could not talk very well cn account of the condition of her bruised throat, but finally she made them understand, although they testified as to the bruised and discolored condition of her throat and face. They took her home, and her daughter notified the police, who soon answered the call.

In the pocketbook that she picked up at the scene of the attack the officers found the social security card of appellant "No. 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, Edward Hart, Jr." and also his selective service draft card, and some other papers. The draft card contained the address of appellant, and the officers went to such address and found that appellant had moved to a dif-

ferent address. When they reached the new location at about daylight they found appellant asleep at the home of his father. The officer awoke appellant and showed him the pocketbook, and appellant said "That's sure my wallet all right." He was then arrested, and about 7 or 8 o'clock on that morning he was positively identified by Mrs. Bednar. She also identified him at the trial. She testified:

"After the officers got to our house and the pocket-book was turned over to them the next time I saw the defendant was that morning about seven o'clock A. M.—that same Sunday morning, November 27th, 1941, which was a matter of three or four hours after he had attacked me; I saw him at that time in the Emergency Hospital as I had been taken there; I then identified this defendant as the negro who had raped me some three hours previously that morning; there is no doubt whatever in my mind about the defendant being the right negro; I could not possibly be mistaken about that; I identified him then and identify him now as being the same negro who struck me down and raped me and stuck his tongue in my mouth."

The officers then went to the place designated by Mrs. Bednar and there found a shoe, some underclothes, a lady's panties and a sanitary pad, all identified by Mrs. Bednar as hers.

We think the evidence unerringly points to appellant as the person who assaulted this lady.

There were no witnesses offered by appellant, and only two bills of exception found in the record, both relating to the argument of the assistant district attorney.

Bill No. 1 complains because the trial court refused to instruct the jury not to consider a certain argument by the assistant district attorney in which he is alleged to have said: "This ravisher is confronted by the victim in three or four hours, and she says he is the man." We think such a remark was a correct conclusion drawn from the evidence presented. That some one had ravished Mrs. Bednar, we feel sure, would not have been denied by anyone who heard the testimony produced herein, and appellant was not only charged as such but was identified as such,—not only by the victim of such offense but the

circumstances rather strongly pointed to him as her assailant. Mr. Webster says to ravish means: "To have carnal knowledge of a woman by force and against her consent; to rape." And of course one who does such things is a "ravisher," and we can see no impropriety in such a statement. We do not think such a statement descends to the level of personal abuse, as does the language quoted in Dodd v. State, 198 S. W. 783, and Fowler v. State, 39 S. W. (2d) 621. In the latter case the court held that the injury from the abusive remarks of the State's attorney, if any, was cured by the trial court's instruction to disregard the same.

In the Dodd case, supra, in a trial for drunkenness, the State's attorney in his argument called Dodd a "liar and a thief," the remarks evidently not called for by the testimony.

We do not think any error is evidenced by this trial court's action in refusing to instruct the jury to disregard the complained of argument.

Bill of exception No. 2 complains of the trial court's refusal to instruct the jury to disregard the argument of the assistant district attorney wherein it is alleged he said:

"By his failure to bring in witness to prove where he was, he is confessing the crime."

It is contended that such a statement was a reference to appellant's failure to testify. The bill of exceptions is in a rather peculiar and incomplete form, as is bill No. 1, but on account of the severity of the verdict, we are considering the same. It is shown by the testimony that about two or three hours after the commission of this offense appellant was arrested by the officers at his father's home in Dallas; that they went to such home and there found appellant's father and asked him the whereabouts of appellant; the father said he was in bed asleep; they then called appellant and he did not answer; they then woke him up; "he was sleeping in his underwear; there were blood stains on his underwear and trousers."

It is evident that if the appellant desired to prove an alibi he could have done so by anyone who knew his whereabouts prior to and at the time of the alleged crime; his father, any

member of the family, or any other person who might have been in a position to know facts beneficial to him.

Where testimony could have been offered by persons other than a defendant, a reference to a failure to produce such testimony in argument is not in violation of Art. 710, C. C. P. See Branch's Penal Code, p. 209, and many cases there cited. This bill not only does not show that appellant alone could have testified to this alibi, as is demanded in Huff v. State, 103 S. W. 394; Reinhard v. State, 52 Tex. Cr. R. 63, 106 S. W. 128, but it is shown by the bill itself, and easily deducible therefrom, that the testimony of others was what the attorney intended to refer to when he said "by his (appellant's) failure to bring in witness to prove where he was he is confessing the crime." If appellant was expected to "bring in a witness" it certainly would be expected to be other than himself, and of course such "witness" could have meant anyone who would answer his purpose in the domain of his acquaintance or contact. It would not mean himself as the only person among such acquaintances who knew of his whereabouts at or about the time the State had fixed as the date of the alleged offense. It surely could have meant his family, the father at least being shown to be present at the time of his arrest.

There are no further matters complained of in the record. We have thus fully written on the matters presented to us in imperfect bills of exception on account of the penalty extracted herein. We think the guilt of appellant has been fully shown by legal testimony, and finding no error in the record it is our duty to affirm this judgment, and it is accordingly so ordered.